# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 1, 2011

## STATE OF TENNESSEE v. JOHN TODD

**Appeal from the Criminal Court for Shelby County**
**No. 06-08050    John T. Fowlkes, Jr., Judge**

---

**No. W2010-02640-CCA-R3-CD  - Filed June 14, 2012**

---

The Petitioner, John Todd, was convicted by a Shelby County Criminal Court jury of one count of first degree murder and one count of second degree murder, Class A felonies.  See T.C.A. §§ 39-13-202 (2006) (amended 2007), 39-13-210 (2010).  He was sentenced to concurrent terms of life imprisonment for first degree murder and twenty years' confinement for second degree murder.  On appeal, he contends that the trial court erred by (1) finding him competent to stand trial; (2) denying his motion to suppress his pretrial statement; (3) denying his motion for a mistrial trial on the ground that an outburst during the trial prejudiced the jury against him and prevented a fair trial; (4) admitting gruesome photographs of the victims at the trial; (5) allowing a medical examiner who did not perform the autopsies to testify at the trial; and (6) denying his request for a mistrial on the ground that the State failed to provide his oral statement reduced to writing before the trial.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined.  JERRY L. SMITH, J., not participating.

Linda Parson Khumalo (on appeal) and Glen Wright (at trial), Memphis, Tennessee, for the appellant, John Todd.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Rachel Newton and Theresa McCusker, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to a domestic dispute during which Earl Smith and his daughter, Deborah Davis, were killed. At the trial, Vertonia Harris testified that Ms. Davis was her cousin. She last saw the victims the day before they were killed. She said that the victims normally sat outside their apartment around 6:00 a.m. daily but that on April 10, 2006, she realized the victims had not left their apartment. She went to the victims' apartment and called out their names through the open window near the front door, but there was no response. She kicked open the front door and searched for the victims. She found Mr. Smith dead in his bed. She said she ran out of the apartment and asked the neighbors to call the police.

Ms. Harris testified that Ms. Davis and the Defendant dated on and off for about one year and that the Defendant stayed at the victims' apartment periodically. She said the Defendant "lived right down the alley" with several people whose names she could not recall. She said Ms. Davis's relationship with the Defendant was "fine." When asked if the victim and the Defendant argued, she said, "They might have had words." On cross-examination, Ms. Harris testified that she saw Ms. Davis's body in the apartment but that she only glanced at her. She did not take time to notice if the victims were fully dressed. She said she could not enter the apartment through the open widow because bars covered it.

Memphis Police Officer John Fleming testified that he and Officer Gregory responded to the scene. He described photographs taken at the scene that showed Ms. Davis lying on the floor in the fetal position in a large amount of blood with a fork lodged in her neck and Mr. Smith lying in bed with blood splattered on the top of the mattress and the wall. The photographs were received as exhibits.

Officer Fleming testified that while he was at the scene, he received information that the Defendant could have been involved in the killings. The Defendant was taken into custody, and Officer Fleming recalled that the Defendant had no injuries. He said the Defendant was found approximately five to ten minutes from the victims' apartment.

On cross-examination, Officer Fleming testified that he did not secure the scene but that he saw it being secured. He went into the victims' apartment, but he did not walk in any of the blood on the floor. He said that the victims' bodies were stiff as though rigor mortis had set in and that their hands were curved. He arrived at the scene late in the morning. He did not recall how the Defendant was dressed when he took him into custody, or if the Defendant had blood on him.

-2-

Memphis Police Officer Lavern Jones, a crime scene investigator, testified that he went to the victims' apartment. He photographed the southwest bedroom where the male victim was found. He identified the photograph of Mr. Smith's body lying on the bed with blood splattered on the top of the mattress and wall. After he collected physical evidence in the bedroom where Mr. Smith was found, he went into the room where Ms. Davis was found. He identified the photograph that showed Ms. Davis's body lying on the floor with a fork lodged in her neck. Officer Jones did not dust for fingerprints and did not know if anyone else did so. Her said his job was only to collect evidence and transport it to the property room.

Charles Tools testified that he lived in the apartment below the victims and that he was the janitor and caretaker of the apartment complex. He said that he knew the Defendant, that the Defendant lived with the victims at times, and that he allowed the Defendant to perform construction and home improvement work at the apartment complex. He last saw the Defendant the morning the victims' bodies were found. He said that around 3:00 or 4:00 a.m. on the same day, he heard kicking, running, and someone yelling "motherf-----, stop" in the victims' apartment. He said the globe on the light on his bedroom ceiling fell and broke because of the running upstairs. He said the layout of his and the victims' apartments was identical and that Ms. Davis's bedroom was directly above his own.

Mr. Tools testified that after the globe fell from the bedroom ceiling, he went upstairs to talk to the victims about the noise and the broken globe but that no one answered the door. He yelled that he knew the victims were inside. He said he saw the Defendant inside the apartment through the window. He said the Defendant stepped out of Ms. Davis's bedroom and said, "I got it." He told the Defendant to "keep it down," and went back to his apartment. He said he was able to see the Defendant because the only light on in the victims' apartment was Ms. Davis's bedroom light. He did not see anyone else in the apartment.

Mr. Tools testified that after he returned to his apartment, he prepared for work. He went upstairs around 7:00 a.m. to talk to the victims about the broken globe, but no one answered the door. He said he knew that neither Mr. Smith nor Ms. Davis had left their apartment because his apartment door was open all night due to the hot temperature. He said that he later encountered another resident named Tanya and that they knocked on the victims' door, but no one answered. He tried to unlock the door with his janitor's key, but the door was jammed. He said that Tanya hit the door with her shoulder, that the door "popped loose," and that Tanya went into the victims' apartment, but that he did not go inside. He said that Tanya came out of the apartment screaming Ms. Davis was dead and that he called the police.

Mr. Tools testified that the Defendant worked with him the day before the victims' bodies were found. He said that work ended around 5:00 p.m. and that he saw the Defendant at the apartment building around 6:00 or 7:00 that evening. He saw the Defendant again around 9:30 or 10:00 p.m. He said he assumed the Defendant stayed in the victims' apartment that night because Ms. Davis was the Defendant's girlfriend. He said the Defendant stayed with the victims "periodically." When he saw the Defendant at 3:00 or 4:00 a.m., the Defendant was wearing the same clothes he wore to work.

On cross-examination, Mr. Tools testified that the Defendant wore a green jumpsuit to work that day and that the Defendant was wearing the same jumpsuit when he saw the Defendant through the window of the victims' apartment. He recalled telling an investigator that the Defendant's jumpsuit was blue, but he said that he knew it was the Defendant inside the victims' apartment. He said he gave Tanya permission to kick open the door because she was afraid of getting into trouble. He did not recall telling the police that Tanya knew Ms. Davis suffered from seizures and kicked in the door to check on Ms. Davis.

Mr. Tools testified that Mr. Smith always sat outside on the porch and that he became concerned when nobody had seen Mr. Smith. The only time Mr. Smith left his home was to cash his check or to go to the hospital when sick. When Mr. Tools saw the Defendant through the apartment window, the Defendant mouthed, "I've got it."

Dr. Marco Ross, Deputy Chief Medical Examiner for the Shelby County Medical Examiner's Office, testified that he did not perform the victims' autopsies. He said Dr. Karen Chancellor, Chief Medical Examiner for Shelby County, performed the autopsies but was unable to attend court. He said he was testifying as the keeper of the records, which were made at or near the time of the autopsies and made in the regular course of business of the medical examiner's office by someone with the knowledge and an occupational duty to record the information. He said it was the medical examiner's regular practice to prepare and keep records, including autopsy reports, photographs, toxicology reports, diagrams, evidence checklists, chain of custody sheets, and death certificates.

Dr. Ross testified that Mr. Smith was seventy-four years old and weighed 137 pounds at the time of death. The autopsy report did not state a time of death. A toxicology analysis showed the presence of cocaine metabolites in his blood. He said Mr. Smith was "probably not significantly" under the influence of cocaine because only metabolites were present in the blood rather than cocaine. He said, however, that there may have been some degree of intoxication, including an increased blood pressure or rapid heart rate. He said it was not likely that Mr. Smith was stronger or more aggressive than usual with the level of metabolites in his blood. He said people under the influence of cocaine who showed signs of "excited

-4-

delirium," or extraordinary strength and high aggression, usually had high levels of cocaine in their blood rather than metabolites.

Dr. Ross testified that Mr. Smith's injuries were recorded on a diagram and that there were multiple lacerations to his face. He said a large laceration on the eye extended up to the forehead. He said there was a laceration on top of the left eyebrow and several lacerations on the left side of the nose, upper lip, and chin. He said lacerations were on the right side of the chin and below the right side of the nose, across the middle of the nose, and below the right eye. A photograph showing some of these injuries was received as an exhibit. He said the photograph did not show all of Mr. Smith's injuries. An enlarged photograph of the injuries was also admitted as an exhibit.

Dr. Ross testified that the enlarged photograph showed the right side of Mr. Smith's head and a large laceration across the eye that extended up to the forehead. He said there were smaller lacerations below the large laceration and a laceration on the right temple. The photograph showed three additional lacerations on the right side of the head. He said that as a result of the blunt force to this area of the head, the skin tore and the skull fractured and collapsed inward, creating a dip in the skull. He said a laceration was a tear in the skin that occurred when a blunt object hit the surface of the body and forced the skin to split open.

Dr. Ross testified that Mr. Smith's injuries were not specific enough to identify the object used to inflict the injuries but that the object was probably an "elongated linear configuration" such as a stick, baseball bat, leg of a chair, or rod. He said the lacerations were consistent with a tire iron. He said there were seventeen lacerations on Mr. Smith's head. He identified a photograph of Mr. Smith's teeth, some of which were found lying on the body. He said Mr. Smith had loose teeth inside his mouth and tooth fragments inside his stomach. He said an examination of the tooth fragments found inside the stomach and the broken teeth inside and around the mouth showed that Mr. Smith swallowed the fragments. The photograph was received as an exhibit.

Dr. Ross testified that a photograph of a magnified section of Mr. Smith's cleaned skull showed the skull fractures on the right side of the forehead. The photograph was received as an exhibit. He said the frontal bone of the skull was fractured due to a blunt object hitting the skull. He said that the "globe" of the right eye ruptured and that the area of the skull below the right eye was crushed. He said a fragment of white metal wire was found inside the skull, which was probably on the blunt object and transferred to the skull when it struck the head. He said that because Mr. Smith did not have wounds on the back of his head, the wounds were consistent with his lying in bed while being beaten and with someone striking him while standing over him.

Dr. Ross testified that two photographs taken during the autopsy showed that Mr. Smith's left hand received abrasions, had a fracture to the little finger, a small fracture to the ring finger, and a tear in the ring finger's skin. The photographs were received as exhibits. He said that the injuries to Mr. Smith's hand were consistent with blunt force trauma and with his holding his left hand over his face while being beaten. He said Mr. Smith was struck in the head a minimum of nine times. He said Dr. Chancellor concluded that the cause of death was multiple blunt force injuries to the head, and he agreed.

Dr. Ross testified that Ms. Davis was forty-three years old and weighed 113 pounds at the time of her death. He said she had a fork lodged in the right side of her neck when she arrived at the Medical Examiner's Office. A time of death was not stated in the autopsy report. A toxicology report showed that she had marijuana in her blood. Her injuries were recorded on a diagram, which was received as an exhibit. He said she had swelling around the right eye, abrasions to the left of the nose and below the left eye, and two lacerations on the back of the head. Photographs received as exhibits showed an abrasion across the forehead and lacerations on the top of the head, a fork lodged in the neck, and the neck wound after the fork was removed. Dr. Ross stated that the wounds around the eye and nose were consistent with a fist striking the area. He said, however, that other blunt objects could have caused the wounds, including an object with a narrow edge.

Dr. Ross testified that the depth of the fork wound on Ms. Davis's neck extended the length of the tines. In most cases involving forks, he only saw separate tine marks in the skin rather than one large wound. He said the force necessary to break human skin depended on the fork. He said the fork lodged in the victim's neck was a dinner fork that was less sharp than a serving fork. The main blood vessels in the neck were not severed, and the injury was not severe enough to obstruct airflow. He said the injury, however, would have caused significant coughing and partially incapacitated her. He stated that although the autopsy report did not show that the fork compressed the airway, it was "conceivable" that her airway could have been blocked with enough force.

Dr. Ross testified that three lacerations on the top of Ms. Davis's scalp ranged from one to two inches in length. He said they were at most one-half inch deep because they did not penetrate the skull. He said the lacerations were caused by a long linear object, such as a tire iron, and could have been caused by the same instrument used to inflict Mr. Smith's injuries. A photograph of her shaved head showing the three lacerations was received as an exhibit. The autopsy showed a fracture to the base of the skull and an injury to the left temple area. He said that one of the fork tines could have caused the injury to the left temple, but that the fork was not related to the skull fracture. He said Ms. Davis was struck a minimum of eight times in the head. He said there were five lacerations on her body.

Dr. Ross testified that there were abrasions around Ms. Davis's eye and across the top of her forehead, which were caused by a different impact than the impact that caused the skull fracture. He said the fingernail of her right ring finger was split, and a photograph of her right hand was received as an exhibit. He could not determine when the fingernail was split. Ms. Davis had no other injuries to her arms and hands. He stated that there was no definitive evidence of injuries to her hands and arms but that light impact might not leave evidence. He said he agreed with Dr. Chancellor's conclusion that the cause of death was multiple blunt force injuries to the head. He added the possibility that Ms. Davis suffered asphyxia or a blocked airway as a result of the fork lodged in her neck.

On cross-examination, Dr. Ross testified that the times of death were based on a normal room temperature, the photographs, and the descriptions of the bodies and were one day to a few days before the victims were found. He said fingernail scrapings were taken from both victims and released to the police. He said that the testing of fingernail scrapings was done by the crime lab, not the Medical Examiner's Office.

Dr. Ross testified that Mr. Smith's injuries were also consistent with his standing upright. He said the white metal wire found in the cranial cavity was given to the police. He said that although it was unlikely that Mr. Smith was significantly intoxicated because of the absence of cocaine in his blood, he did not know if Mr. Smith was the aggressor. He said cocaine could make someone aggressive, but the level of cocaine necessary to create aggressive behavior was absent.

Memphis Police Lieutenant James Currin testified that he interviewed the Defendant after his arrest. He said that the Defendant first denied knowing what happened to the victims. The Defendant told him that he left the victims' home to look for "crack" and spent the night at a home on Crump Boulevard. The Defendant said he and the homeowner left the Crump Boulevard home at 6:00 the next morning. As the conversation continued, the Defendant eventually told Lieutenant Currin that he was responsible for the killings and described what happened. The Defendant said that

> Mr. Smith . . . scared him earlier in the night[,] saying that he was tired of him arguing with his daughter and that he was going to do something if he didn't - so, that at some point later in the night, he went into the bedroom while Mr. Smith [was] laying [sic] down and had a tire iron and hit him in the head several times with the tire iron, and then, went into the bedroom where [Ms. Davis] was at and they got into some sort of altercation. He stated that she had a fork and tried to stick him

-7-

with it and that he turned the fork back on her and stabbed her in the neck.

The Defendant's signed statement was received as an exhibit.

On cross-examination, Lieutenant Currin testified that he did not believe the Defendant when the Defendant denied involvement in the killings. He said that after the Defendant initially denied involvement in the killings, he asked Detective Woods to verify if the Defendant was at a home on Crump Boulevard around the time of the killings. He said Detective Woods went to the address on Crump Boulevard and spoke with the people who lived there.

Lieutenant Currin testified that he did not know the Defendant had been declared "mentally retarded" but that the Defendant did not "seem slow" to him.[1] He said although the police did not find a tire iron or the Defendant's bloody clothes where the Defendant said he placed the items, he did not believe the Defendant's denial of involvement in the killings.

Memphis Police Officer James Woods testified that he was told to go to a house on Crump Boulevard, which was adjacent to the apartment complex, to look for clothing. He said the homeowner allowed him to look for the clothing and anything else that was linked to the killings. He found nothing, returned to the police station, and reported to his sergeant. He said that after the Defendant gave his statement, he read the statement to the Defendant because the Defendant was illiterate. On cross-examination, Officer Woods testified that he did not record his reading the Defendant's statement, but he assumed the Defendant's interview was recorded because it was police procedure to record interviews.

Donald Dodson testified that the Defendant lived with him for six to seven years at 578 Crump Boulevard. He said he knew Ms. Davis, whose apartment was thirty to forty feet from his home. He saw Ms. Davis going to the store around 4:00 or 4:30 p.m. the day before she was killed. He said that he had known Mr. Smith all his life and that he last saw Mr. Smith around 1:00 or 1:30 p.m. two days before he was killed. He said Mr. Smith watched him and a few people play basketball from his apartment balcony. He said the Defendant stayed overnight at the victims' apartment.

---

[1] We note that on April 9, 2010, the General Assembly ordered all references to "mental retardation" in Tennessee Code Annotated to be changed to "intellectual disability." See 2010 Tenn. Pub. Acts 734. The testimony of the witnesses is provided as given.

Mr. Dodson testified that the Defendant worked on cars and mowed lawns for money and that the Defendant wore a blue jumpsuit while working. He said the Defendant had many tools, which he kept on the side of Mr. Dodson's house. He said he saw the Defendant around 5:30 a.m. the day the victims were found. He said the Defendant came into his house while Mr. Dodson got ready for work. He said the Defendant acted strangely and changed clothes unusually quickly. He said the Defendant wore a white t-shirt, a jumpsuit, and white sneakers. He said the Defendant wore a blue jumpsuit the day before the victims were killed.

Mr. Dodson testified that the Defendant came to his house around 7:00 p.m. the night before the victims were found and told him that Ms. Davis had a seizure but was going to be okay. When he asked if the Defendant called the paramedics, the Defendant said that he gave Ms. Davis a "drink of water" and that she was okay. The Defendant stated several times that "God don't like ugly. And when you mess with God's child, something bad going to happen to you."

Mr. Dodson testified that he had seen the Defendant with a tire iron and that the Defendant made weapons called "shanks." He said the Defendant made weapons with spears and would tell people that when "BooBoo came out, something bad was going to happen." The Defendant told him that BooBoo was the Defendant's "other side."

On cross-examination, Mr. Dodson testified that although the Defendant did not live at his home, the Defendant kept clothes and received his disability check there. He said the last place the Defendant lived was the victims' apartment. He said that when the Defendant left his home around 7:00 the night before the victims were found, the Defendant wore a white t-shirt, blue jumpsuit, and white sneakers. He said the Defendant had the same clothes on the following morning at 5:30.

The Defendant was convicted of one count of first degree murder and one count of second degree murder. He received concurrent sentences of life imprisonment for first degree murder and twenty years' confinement for second degree murder. This appeal followed.

**I**

The Defendant contends that the trial court erred by finding him competent to stand trial. He argues that the testimony at the competency hearing established that he had a very limited understanding of language and did not have the capacity to understand the nature and object of the proceedings against him. The State responds that the trial court properly found the Defendant competent to stand trial. We agree with the State.

At the competency hearing, Dr. Joseph Angelillo, a licensed clinical psychologist, testified that he interviewed the Defendant on October 31, November 1, and November 2, 2007, and again on January 9, 2009. He conducted a clinical interview and administered psychological tests, which took a total of twelve to fifteen hours to complete. He said the Defendant understood who Dr. Angelillo was and the reasons for his visits. He said, however, that the Defendant was not oriented as to the dates or times of his visits.

Dr. Angelillo testified that based on his interviews with the Defendant and the psychological test results, he concluded that the Defendant had significant problems in the three areas addressing competency. He concluded that the Defendant was not competent to stand trial. He said the Defendant had difficulty with factual understanding because he had problems describing the people and their roles within the criminal justice system. He said the Defendant also had difficulty reasoning and appreciating circumstances.

Dr. Angelillo testified that he performed three major psychological tests, which were the MacArthur Test related to factual understanding; the Woodcock-Johnson Test of Cognitive Abilities related to cognitive ability, verbal comprehension, and concept formation; and the Concept Formation Test related to the ability to change thought patterns and move from one topic to another. He stated that the Defendant underwent psychological testing throughout his life and that the results of his tests were consistent with the previous findings. He said the Defendant's previous psychological test results were used both as a basis for his overall opinion on the Defendant's competency and as a basis to start his analysis. He said a patient's previous psychological history was important because it showed whether a patient's functioning was consistent over time or suddenly changed. In 1974, the Defendant was fourteen years old and had an IQ of 66. In 1977, the Defendant was seventeen years old and had an IQ of 60, and one year later, his IQ was 64. Dr. Angelillo said the instant cognitive tests were consistent with previous IQ tests.

Dr. Angelillo testified that the Wide Range Assessment of Memory and Learning Test measured verbal memory, visual memory, attention, concentration, and memory generally. He stated that the Defendant scored within the first percentile in the verbal memory area, meaning that the Defendant was not able to process and recall information well. He said the Defendant had difficulty remembering information seconds after it was given to him. These results led him to conclude that it would be difficult for the Defendant to follow a trial and to use information presented in court.

Dr. Angelillo testified that he administered the Rorschach and Thematic Apperception Tests. He said that the Rorschach Test was commonly called the ink blot test and that the Defendant gave "overly simplistic" answers. He said the Defendant's answers were the result of organicity, psychopathology, low intelligence, or low cognitive sophistication. The

Thematic Apperception Test involved showing pictures or drawings of people in some type of "simple and concrete interaction." He said the Defendant's responses showed "immature problem solving skills." He said the Defendant had difficulty finding similarities between situations and events.

Dr. Angelillo testified that to test the Defendant's reasoning skills, the Defendant was read a short scenario and asked to determine the relevance of certain aspects of the scenario. He said that a person's performance was categorized as either impaired, moderately impaired, or significantly impaired and that the Defendant's performance was significantly impaired. To test the Defendant's appreciation, the Defendant was asked to take some of the facts from the scenario and apply those facts to his case. He said the Defendant's performance was significantly impaired. To test the Defendant's understanding, the Defendant was asked to identify the roles of various persons involved in the criminal justice system, including the judge, the jury, the prosecutor, and the defense attorney. He said the Defendant had a "very basic understanding" of those individuals and the features and characteristics of a criminal proceeding.

Dr. Angelillo testified that malingering "is the conscious feigning of an illness . . . in order to gain something." Both healthy and sick persons could show signs of malingering. To determine if the Defendant was malingering, he used the Structured Interview of Malingering Symptomatology, and the Defendant showed no signs of malingering.

Dr. Angelillo testified that the Defendant had a documented childhood and adolescent history of acting impulsively after an event occurred. He said that the Defendant answered questions quickly, which led him to repeat the questions, and that it was difficult for the Defendant "to take in the whole question before he responded." He said that at times, portions of the Defendant's responses made no sense in the context of the question asked, which led him to conclude that the Defendant's responses during cross-examination would be "questionable" unless the prosecutor asked the Defendant "what do you think this means" and "do you know what this word means." He said it was important to ask the Defendant if he understood the meaning of a particular word. He said cross-examination of the Defendant would be difficult and time consuming because the prosecutor needed to ask questions to show the Defendant's reasoning. He said this process was necessary because he felt that the Defendant gave answers without understanding what was asked.

Dr. Angelillo testified that he asked the Defendant his birth date and that the Defendant had to look at his identification armband to answer the question. He included the Defendant's response in his report because it addressed the Defendant's mental status. He said, though, that the Defendant's failure to know his birth date was not a factor in reaching his conclusion about the Defendant's competency. He believed the Defendant was "mentally

retarded." He said the Defendant was diagnosed as "mentally retarded" before he turned eighteen years old. His report was received as an exhibit.

On cross-examination, Dr. Angelillo testified that he thought the Defendant understood that he was charged with murder and that he faced a significant period of confinement if convicted. He believed the Defendant had a "very basic" understanding of a jury. The Defendant told him that the prosecutor's job was to "find the other man guilty" and that the defense attorney's job was "to find him innocent." He did not ask the Defendant about witnesses or the Defendant's role in the process.

Upon examination by the trial court, Dr. Angelillo testified that the Defendant was "mentally retarded" and that his results were consistent with previous test results. He stated that he did not know if a physical defect caused the Defendant's impaired cognitive ability but that many things from his childhood could have caused the Defendant's impairment, including childhood malnutrition. When asked if the Defendant had a mental defect, he stated that the Defendant had a "mental defect from the cognitive defect" of his being intellectually disabled. He did not test for defects such as schizophrenia, but he concluded that the Defendant had difficulty with reality. He said that there were different kinds of memory and that the Defendant was able to process new information if it came from his own experience. He said, however, the Defendant had difficulty processing information received from other people.

Dr. John Hutson, a forensic psychologist, testified on behalf of the State that he evaluated the Defendant's competency in January 2008. The Defendant told him that he had an eighth grade education and took special education classes. He said the Defendant's school records showed an eleventh grade education. The Defendant told him that he was previously charged with domestic violence, aggravated assault, and concealing and receiving stolen property. The Defendant told him that he spent time at the penal farm but not in prison. The Defendant's criminal history showed he was also previously charged with contempt and public drunkenness.

Dr. Hutson testified that the criteria used for competency is that a defendant must have a basic understanding of the judicial process, or an understanding of a defendant's support, opposition, and how a case is decided. A defendant must be able to confer rationally with his attorney, although a defendant is not required to want to speak with his attorney. A defendant must understand the offense with which he is charged and the maximum punishment for that offense. He said the Defendant understood these concepts. He said the Defendant understood the concept of plea bargaining because he had reached plea agreements in previous cases and understood that plea bargaining was advantageous for guilty defendants.

Dr. Hutson testified that the Defendant understood he was charged with murder and faced a possible sentence of life imprisonment. He thought the Defendant understood the meaning of a life sentence but could not be certain. The Defendant told the social worker on Dr. Hutson's team that life imprisonment meant he would "never get out." The Defendant told the social worker that his attorney was "for him" and had to show that he was innocent and that the prosecutor was "against me" and had to show that he was guilty. He told the social worker that the judge's job was to listen, punish, and make decisions. The Defendant told Dr. Hutson that the judge asked the prosecutor and his attorney to "tell their sides." He told the social worker that the jury's job was to vote on his innocence or guilt. The Defendant told Dr. Hutson that the jury's job was to "see if you're innocent or guilty." He said the Defendant said innocent meant that he "did not do it." When the Defendant was asked about his role in the proceedings, the Defendant told the social worker that he had to prove his innocence. The Defendant, however, only said "me" to Dr. Hutson when asked about his role. The Defendant told the social worker that the role of a witness was to "tell the truth about whatever they've seen," but told Dr. Hutson that witnesses "told stories."

Dr. Hutson testified that his questions were designed to determine if the Defendant understood the charges against him, the behavior that led to the charges, and his being accused of committing a crime. With regard to these subjects, the Defendant told the social worker he had an alibi. He said the Defendant understood the capacity to challenge witnesses to mean that witnesses "could not lie." He said that the social worker noted that the Defendant was "impulsive but not psychotic" and that his behavior showed he was self-serving. He said the Defendant did not know that trial counsel was his appointed defense attorney. The competency evaluation took about thirty minutes and was the average length for an evaluation. He said the Defendant did not require explanations during the evaluation. He stated that the Defendant was not a "high-functioning" person but that he was impressed with the Defendant's vocabulary and responsiveness. There was no evidence of malingering.

Dr. Hutson testified that he did not perform the psychological tests performed by Dr. Angelillo because they were unnecessary. He said, however, that the MacArthur Test could have been relevant. He said that the MacArthur Test was not developed to test competence, but rather to evaluate people who became incompetent after hospitalization and that there was no baseline group of incompetent people. He said the criteria for the MacArthur Test was not representative of the Supreme Court standards for competency and required a higher standard than the Supreme Court. He said the ability to confer was critical and most difficult for persons with mental illness. He said, however, that the Defendant was not mentally ill and that he recommended that the trial court find the Defendant competent to stand trial.

Dr. Hutson testified that the Defendant was evaluated twice in June 2006, once in February 2007, and twice in January 2008, to determine his competency. He said each

evaluation concluded that the Defendant was competent to stand trial. His records showed that the Defendant was not evaluated for any other criminal proceeding. He said, however, that it was important to understand that the Defendant was "mildly mentally retarded" and that the Defendant had difficulty with language. He believed, however, that the Defendant's intellectual limitations were not severe enough to render him incompetent. He said it was important to use language that the Defendant understood and for his attorneys to explain to him what occurred during court proceedings.

On cross-examination, Dr. Hutson testified that in evaluating the Defendant's ability to relate to his attorney, he asked the Defendant to identify his attorney and asked how he and his attorney got along with each other. He agreed that on February 12, 2007, the Defendant said that he did not think his attorney was going to help him. He clarified that another member of the team evaluated the Defendant on the previous dates and that his testimony on direct examination was related to the last evaluation in 2008. He agreed the Defendant said during the first June 2006 interview that the Defendant spoke with an attorney at his last court date. He said that during the February 12, 2007 interview, the Defendant said he had not talked to his attorney. On January 8, 2008, the Defendant said he had not seen his attorney.

Dr. Hutson testified that the Defendant had intellectual limitations but that his attorneys could explain courtroom events. He said the Defendant did not have an attorney when he spoke to the police. He disagreed that a defendant needed to have a rational understanding of the court system and the role of the individuals within the court system to be competent. He said a defendant needed an "irrational order" to be incompetent. He did not find the MacArthur Test relevant and did not use it. He said the MacArthur Test was used in his profession but did not know the frequency with which it was used. He speculated that the test was not used in the majority of competency evaluations.

Dr. Hutson testified that the Defendant's school records from the ninth to eleventh grades came from the Tennessee Preparatory School, a defunct boarding school. He said he thought the school was run by the Department of Juvenile Correction and was unaware the school had a special needs program. The Defendant's attendance at the school did not change his opinion of the Defendant's intellectual capacity.

On redirect examination, Dr. Hutson testified that most of the people he evaluated had intellectual limitations but were competent to stand trial. He said individuals became incompetent when they failed to meet the criteria defined by the Supreme Court. He said the critical question was whether a defendant understood the charge and potential consequences. He believed the Defendant understood the charges, the potential consequences, and the roles of the individuals involved in the criminal justice system.

-14-

Dr. Hutson testified that there were degrees of rationality even when a person was mentally ill. He said the Defendant was not mentally ill. He said a mental illness did not always impair or significantly interfere with the ability to confer with an attorney. He stated that in some cases, a mentally ill defendant had "an encapsulated delusional system" but that if it was not related to court proceedings, the charges against the defendant, or the defendant's attorney, the defendant was still competent to proceed to a trial. He said a defendant who was mentally ill could still be competent. He said the Defendant's intellectual ability was an issue for his competency, not his rationality.

Donald Dodson testified that he had known the Defendant for about thirteen years and that the Defendant lived with Mr. Dodson's grandfather. He saw the Defendant daily for ten years. He said the Defendant did not have a regular job but did odd jobs, including repairing and cleaning cars and mowing yards. He and the Defendant were good friends and discussed women and sports. He said the Defendant appeared to understand him and had no difficulty talking to him or interacting with other people in the same manner. He was aware that the Defendant obtained his own food and paid his own rent. He said the Defendant drove Mr. Dodson's car a few times without incident.

Upon examination by the trial court, Mr. Dodson testified that when he needed help washing or moving a car, he paid the Defendant to help. He said the Defendant paid rent to Mr. Dodson's grandfather. He said that the Defendant received family services benefits and that Mr. Dodson's grandfather received one-half of the check from family services. The Defendant lived with Mr. Dodson's grandfather for about two and one-half years. He said that although something happened that caused the Defendant to move out of Mr. Dodson's grandfather's house and into a nearby house, the Defendant visited Mr. Dodson's grandfather daily. He said the Defendant lived in the nearby house for about six months but moved out with "the young lady down the alley." On cross-examination, Mr. Dodson testified that his grandfather and the Defendant received family services benefits and that the Defendant gave each check to Mr. Dodson's grandfather.

Vertonia Harris testified that the Defendant lived in her neighborhood for about ten years and that she saw the Defendant daily. She said the Defendant earned money by performing odd jobs, which included helping people move, cutting grass, and running errands. She and the Defendant spoke on a regular basis. She believed the Defendant understood their conversations and said he had no difficulty expressing himself. The Defendant did not seem "slow" to her. She saw the Defendant interact with other people in the neighborhood and said the Defendant had friends with whom he talked on a regular basis. She said the Defendant was able to drive a car.

Dr. Angelillo, recalled by the defense as a rebuttal witness, testified that he was familiar with the Supreme Court's standard of competency. See Dusky v. United States, 362 U.S. 402 (1960). He said sufficient present ability to confer with an attorney with a reasonable degree of rationality was important. He said there must be "a factual as well as a rational understanding of the proceedings" under the Dusky standard. He said that he evaluated the Defendant's ability to understand the proceedings of a trial rationally and concluded that his ability to understand was "severely impaired." He said the Defendant tested in the significantly impaired range, the highest level of impairment.

Dr. Angelillo testified that he performed numerous tests because the validity of the conclusions increased with the number of valid instruments used. He said the profession frowned upon a single source for reaching a conclusion. He said each test used in evaluating the Defendant was appropriate for evaluating competency and accepted within his field. He said the tests were "efficient and excellent" tests to evaluate competency because the tests allowed for insight into a person's thought patterns.

Dr. Angelillo testified that the Rorschach Test was valid and relevant to the Defendant's ability to understand the proceedings of a trial rationally. He said that at one point in his evaluation, he told the Defendant the correct answer to a question and asked the Defendant to repeat it. He said the Defendant repeated the answer, but with difficulty. He could not recall if the Defendant was able to rephrase the correct answer into his own words. He said his last evaluation of the Defendant was in January 2009 and was included in his conclusion of the Defendant's incompetency. He said that a person who could cut grass, obtain his own food, drive a car, help someone move, give a disability check to a landlord, and hold conversations could still be incompetent to stand trial.

Upon examination by the trial court, Dr. Angelillo testified that someone who functioned normally in society could be incompetent to stand trial. He said the questions he was asked during cross-examination focused on cognitive function, which related to competency. He agreed with the court that the Defendant's cognitive ability was at a level that allowed him to operate as a "normal" person. He said, however, that a "mentally retarded" person or someone diagnosed with schizophrenia could be competent to stand trial.

The trial court found the Defendant competent to stand trial. The court noted that in Dusky, the United States Supreme Court said that "'the test must be whether he, a defendant, has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding. And whether he has a rational as well as factual understanding of the proceedings against him.'" 362 U.S. at 402. The trial court also noted that in State v. Reid, 164 S.W.3d 286, 306 (Tenn. 2005), our supreme court said that "to be competent to stand trial, a defendant in a criminal case must have 'the capacity to understand the nature and

object of the proceedings against him, to consult with and to assist in preparing his defense.'"
(quoting State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991) (internal citation omitted)).

The trial court found that the Defendant's expert testimony showed that Dr. Angelillo
interviewed the Defendant for about three hours and performed a battery of tests over twelve
hours. The court said that Dr. Angelillo looked for the Defendant's factual understanding,
reasoning ability, and specific appreciation. The court found that Dr. Angelillo concluded
that the Defendant's reasoning ability and specific appreciation were impaired. The court
found that Dr. Angelillo believed the Defendant had a basic understanding of the specific
roles of the participants in court proceedings but that Dr. Angelillo believed the Defendant's
reasoning ability was impaired.

The trial court found that many of Dr. Hutson's findings were similar to Dr.
Angelillo's findings but that Dr. Hutson reached a different conclusion about the Defendant's
competency. The court found that Dr. Hutson believed the Defendant understood the roles
of the people involved in a court proceeding. The court noted that Dr. Hutson, unlike Dr.
Angelillo, believed the Defendant could confer with his attorney, understood the possible
outcomes of his case, and had an appreciation for the circumstances surrounding his case.
The court found that both experts believed the Defendant had some level of "retardation" but
differed in its degree. Although Dr. Angelillo believed the Defendant was incompetent, Dr.
Hutson believed the level of retardation was not severe enough to render the Defendant
incompetent. The court noted the lay witness testimony regarding the Defendant's level of
interaction within the community.

The trial court found that both experts believed the Defendant had an understanding
of the court process. The court noted that the Defendant "gave solid answers" about the roles
of the prosecutor, the defense lawyer, and the defendant and about the similarity between the
roles of the judge and the jury. The court found that based on the record as a whole, the
Defendant understood the nature of the proceedings and the roles of the parties and could
assist his attorney in his defense. The court said the Defendant seemed "to have a rational
ability to understand what's going on and to assist his counsel." The court noted that it was
"troubled by many of the answers" provided at the hearing but said that after reviewing the
entire record, the court was confident that the Defendant had sufficient understanding to be
found competent.

"The Fourteenth Amendment to the United States Constitution and article I, section
8 of the Tennessee constitution prohibit the trial of a person who is mentally incompetent."
Reid, 164 S.W.3d at 306 (citing Pate v. Robinson, 383 U.S. 375 (1966); State v. Blackstock,
19 S.W.3d 200, 205 (Tenn. 2000)). A defendant must have "the capacity to understand the
nature and object of the proceedings against him, to consult with counsel and to assist in

-17-

preparing his defense." Mackey v. State, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975); see Black, 815 S.W.2d at 174. A trial court's findings regarding a defendant's competency to stand trial are conclusive on appeal unless the evidence preponderance otherwise. Reid, 164 S.W.3d at 306; State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991) (citing Graves v. State, 512 S.W.2d 603 (Tenn. Crim. App. 1973)). The Defendant has the burden of establishing incompetence to stand trial by a preponderance of the evidence. Reid, 164 S.W.3d at 306-07.

Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law, which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The trial court noted the differing conclusions of Drs. Angelillo and Hutson and found that the Defendant understood the nature of the proceedings and the roles of the parties and could assist his attorney in his defense. Dr. Hutson testified that the Defendant had a basic understanding of the judicial process, understood that he was charged with murder and faced a possible sentence of life imprisonment, understood the roles of the judge, the prosecutor, the defense attorney, and the jury, and had the ability to communicate with his attorney. Although Dr. Hutson believed the Defendant was "mildly" intellectually disabled, he also believed the Defendant's limitations were not severe enough to render him incompetent. The trial court weighed the testimony of Dr. Hutson more heavily than that of Dr. Angelillo and found that the Defendant had "a rational ability to understand what's going on . . . and that the Defendant had a sufficient understanding" for its conclusion that the Defendant was competent to stand trial.

The testimony of Mr. Dodson and Ms. Harris also supports the trial court's finding. Mr. Dodson and Ms. Harris testified that the Defendant did odd jobs around the neighborhood, including mowing yards, repairing and cleaning cars, helping people move, and running errands. Mr. Dodson and Ms. Harris said the Defendant had no difficultly communicating with them or other people in the neighborhood. The record does not preponderate against the trial court's finding that the Defendant was competent. See Reid, 164 S.W.3d at 306. The Defendant is not entitled to relief on this issue.

## II

The Defendant contends that the trial court erred by denying his motion to suppress his pretrial statement to the police. He argues that the trial judge should have focused on the Defendant's "mental disability" rather than whether there was coercive State action during the police interview. The State contends that the trial court properly denied the Defendant's motion to suppress and that the issue is without merit. We agree with the State that the trial court did not err by denying the motion to suppress.

Although expert testimony by Drs. Angelillo and Hutson was given at the competency hearing, their testimony, in relevant part, addressed the Defendant's ability to provide a knowing and voluntary statement to the police. The trial court considered the relevant portions of the expert testimony in reaching its decision to deny the motion to suppress.

Dr. Angelillo testified that he tested the Defendant's ability to understand his Miranda rights and his ability to knowingly and voluntarily waive those rights. He performed The Understanding and Appreciation of Miranda Rights Test. The first portion of the test measured the Defendant's ability to state in his own words and describe the contents of the Miranda warnings. He said the Defendant "had a great deal of difficulty" because it was difficult for the Defendant to "do anything but repeat," or "parrot," the language of the warnings. The second portion of the test measured the Defendant's vocabulary, and the Defendant received an "extremely low" score. In the third portion of the test, Dr. Angelillo read two statements and asked the Defendant if the statements were similar or different. He stated that this portion evaluated the Defendant's ability to determine the meaning of statements and that the Defendant did "extremely" poor. In the last portion of the test, the Defendant was shown and asked to describe various scenarios. He said that the Defendant's score was higher on this portion but that his score was only in the fortieth percentile.

Dr. Angelillo testified that the Defendant was not "suited" to make a knowing and voluntary waiver of his Miranda rights because of his lack of understanding. He said the Defendant's deficiencies in vocabulary and abstracting ability prevented him from making a knowing and voluntary waiver of his rights. He said the Defendant lacked an ability to understand the alternative courses of action and the results of each. He believed that individuals with low intellectual functioning engaged in "people pleasing" behavior.

Dr. Angelillo testified that he asked the Defendant to define the right to remain silent and that the Defendant said, "Shut up." He said this was one of the Defendant's better responses, but he could not conclude the Defendant understood that he had the choice not to respond to the police officers' questions. He said that based on the test results, the Defendant had a "great deal of difficulty . . . understanding virtually anything unless it [was] in . . . a

-19-

very calm" environment and things were repeated multiple times and in different ways. He speculated that the stress of a police interview would have made it more difficult for the Defendant to understand. The Defendant did not display signs of distress during testing, but Dr. Angelillo thought it was possible that his findings would have been worse had the Defendant been under stress.

On cross-examination, Dr. Angelillo testified that the Miranda test was important to determine competency, but said the Defendant's cognitive ability and vocabulary were also related to his ability to understand the warnings. He said the test gave credit for a test subject's answers liberally and did not require eloquence. On redirect examination, Dr. Angelillo testified that although the Defendant had a basic factual understanding of his rights, the Defendant did not understand his Miranda rights.

Dr. Hutson testified that with regard to the Miranda test performed by Dr. Angelillo, there were local differences in the manner in which police officers gave Miranda warnings and that the test failed to take those differences into consideration. He said the test also failed to take a person's previous experience with Miranda warnings into consideration. He noted the Defendant's experience with Miranda warnings from his previous arrests. He said, though, that the language used in the Defendant's case was basic and that he was comfortable with the Defendant's response that to be silent meant to "shut up." He did not evaluate if the Defendant understood the nature of his rights and the consequences of waiving them.

At the suppression hearing, Memphis Police Sergeant James Currin, who was a lieutenant at the time of the trial, testified that he and another homicide detective interviewed the Defendant around 4:00 or 5:00 p.m. He said the first thing he did when he began an interview was check on the person's well-being and ask if he needed to use the restroom or wanted something to drink. He said he advised individuals of their Miranda rights before talking to them. He said he usually tried to find out if the person being interviewed could read before reviewing the advice of rights form.

Sergeant Currin testified that the Defendant told him that he could not read. He said Sergeant Collins read the advice of rights form to the Defendant. He said that he asked the Defendant, "do you understand each of the rights I explained to you," and that the Defendant wrote "yes" and signed his initials on the form. He said that he asked the Defendant, "having these rights in mind, do you wish to talk to us," and that the Defendant wrote "yes" and signed his initials. The Defendant signed and dated the form. The advice of rights form was received as an exhibit.

Sergeant Currin testified that after he advised the Defendant of his rights, he asked the Defendant if he understood the meaning of the rights. He said the Defendant paraphrased

his rights and stated that he understood that he did not have to talk to the police and could have an attorney present at any time. He said the Defendant used different words than "you have the right to remain silent" when he explained his rights. He said he noted the Defendant's response in his supplemental report. He said the Defendant began talking after the Defendant signed and dated the form.

On cross-examination, Sergeant Currin testified that he met the Defendant at 4:00 p.m. and that the Defendant signed his statement at 9:00 p.m. He said he was not in the room with the Defendant for the entire five hours because he left the room to verify information provided by the Defendant and to have the Defendant's statement transcribed. He could not recall if the Defendant was handcuffed but said the Defendant was shackled.

Sergeant Currin testified that the signed statement was the only statement the police transcribed but that the Defendant was questioned before the statement was written. He could not recall if the Defendant's earlier statements were transcribed but said none of the Defendant's statements were recorded. He did not recall if the Defendant's initial description of what happened differed from the final written statement.

Sergeant Currin testified that he assumed but did not know if the Defendant's statement was verbatim. He did not recall the amount of time the Defendant had been in custody before 4:00 p.m., but he recalled the Defendant was taken into custody earlier the same day. He told the Defendant that he was under arrest when the Defendant was read his rights.

Tim Helldorfer testified that he was a former homicide detective with the Memphis Police Department and that he was present when the Defendant gave his formal statement. He said that before the Defendant gave the statement, he advised the Defendant of his rights for a second time. He said that the Miranda warnings were on a computer screen in the interview room but that he read the rights to the Defendant because he knew the Defendant could not read. He said the Defendant could see the computer screen. He said that the Defendant stated that he understood his rights and answered his questions with clear, quick answers without hesitation. He said the Defendant was asked to note the time at the end of his interview and the Defendant said, "In the morning hours before the sun came up." He asked the Defendant if he gave his statement freely and voluntarily, without threats and promises or coercion, and the Defendant said, "I gave it willing and freely."

Mr. Helldorfer testified that the Defendant described the events leading up to the killings and that the Defendant said, "She pushed me and I hit her and then she grabbed a fork, and I reversed it and it went into her neck." He said these were the Defendant's exact words. After the Defendant's statement was typed, the statement was read to the Defendant

by a third person while Mr. Helldorfer was not present. He stated that if a suspect had difficulty understanding him, the staff would address the problem and decide how to proceed. He said, though, that the Defendant did not have difficulty understanding him and that the Defendant signed his statement at 9:00 p.m. The Defendant's statement was received as an exhibit. He said the Defendant did not ask for an attorney during the interview.

On cross-examination, Mr. Helldorfer testified that he was only in the interview room during the taking of the Defendant's formal statement. He agreed he was not in the interview room when the Defendant first arrived at the police station or during the initial questioning. He agreed he did not know what occurred before he went in the interview room. He agreed he was not present while the third person read the Defendant's statement to the Defendant. He did not witness the Defendant sign his statement.

Mr. Helldorfer testified that he did not know the time of the Defendant's arrest. He was the officer in charge of the investigation, was present at the scene, and delegated various tasks to different officers. He said that if a suspect said "uh-huh" during a statement, the transcriptionist would not type "yes." He said, though, that if someone paused and said, "uh," he was not sure if "uh" was typed into the statement. He did not edit statements.

Memphis Police Detective James Woods testified that he read the Defendant's formal statement to the Defendant because he was told the Defendant could not read. The Defendant and a secretary were the only other people in the room. He said that he read the Defendant's statement word-by-word and that the Defendant seemed to understand. He told the Defendant that the Defendant should say "stop" if he did not understand. He stated that after he read the statement, he asked the Defendant to initial and date the statement. He said the Defendant did not say that the statement was inaccurate or that the statement should be changed.

On cross-examination, Detective Woods testified that the Defendant did not ask questions while he read the statement aloud. He said he read each question and the Defendant's answer, paused, and asked the Defendant if he understood the question and answer. The Defendant said he understood. Detective Woods did not record himself reading the Defendant's statement. He spent fifteen minutes reading the Defendant's three-page statement. He said the Defendant was in custody for five hours before he read the Defendant his statement.

Memphis Police Lieutenant Mark Winters testified that on December 2, 1998, he was assigned to the general assignment bureau and took the Defendant's statement related to an aggravated assault. He said that before the Defendant made the statement, he read the Defendant his Miranda rights. He said that after he read the Defendant his rights, he asked

-22-

the Defendant if he understood the rights and the Defendant said, "Yes." He said the Defendant initialed the waiver of rights form showing that he wanted to talk to the police. He wrote the Defendant's statement. He said that he and the Defendant had a conversation and that the Defendant looked and sounded as though he understood. The Defendant signed and dated the statement. The Defendant's December 2, 1998 statement was received as an exhibit.

On cross-examination, Lieutenant Winters testified that his conversation with the Defendant consisted of what was contained in the written statement. He said he prepared a list of questions to ask the Defendant before the interview, which was police protocol in 1998. The Defendant told him that he could not read well. Lieutenant Winters did not know that the Defendant could not read, but he always read a statement to a suspect if they acknowledged difficulty reading. He said he read the questions and the Defendant's answers to the Defendant. The Defendant told him that he completed the tenth grade.

The trial court denied the Defendant's motion to suppress his pretrial statement. The court stated that the totality of the circumstances must be considered in determining if the Defendant made a knowing and voluntary waiver of his <u>Miranda</u> rights. The court found that the Defendant's statement was freely and voluntarily given. The court found that there was no evidence of coercion, violence, threats, or promises by the police, and noted that the officers' testimony was unrebutted. The court stated that it considered the Defendant's age, mental capacity, "retardation," the manner in which he lived his life, and his ability to live a "relatively" normal life.

The trial court found that the Defendant had a history with the criminal justice system and that he was "not unfamiliar" with providing statements to the police. The court noted that the Defendant gave a statement to the police ten years earlier and that the testimony of the officer who took the Defendant's statement showed the Defendant understood his rights. The court found that although the Defendant could not read, the officers read the questions and answers to the Defendant in the current case. The court said that although Dr. Angelillo testified that the Defendant "parroted" rather than rephrased concepts in his own words, the answers that the Defendant gave during his police interview were "enlightening" and contradicted Dr. Angelillo's testimony. The court stated that the Defendant's statement showed the Defendant said that "he did it" and "felt better after talking about it" when the officer asked if the Defendant wanted to add anything to his statement. The court also noted that with regard to the Defendant's giving his statement "willingly and freely," a defendant's answer was usually "yes" or "no." The court found that the Defendant did not "parrot" his responses because the officer asked if the Defendant gave his statement "freely and voluntarily without threats or promises," and the Defendant's response was that he gave it "willing and freely." The court found that the record did not show that the Defendant was

unduly susceptible to suggestion or that the officers created a coercive environment. The court found that the Defendant made a knowing and voluntary waiver of his Miranda rights.

The United States and Tennessee Constitutions protect a suspect from "being compelled to give evidence against himself." State v. Berry, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9). If a suspect is in custody and under state-initiated interrogation, the police must first inform him of his Fifth Amendment rights in order for his confession to be admissible as substantive evidence in the trial of the matter. See Miranda v. Arizona, 384 U.S. 436 (1966).

"The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (citing State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994)); see State v. Northern, 262 S.W.3d 741 (Tenn. 2008). For a confession to be considered voluntary, it must not be the product of "'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). The essential question is "'whether the behavior of the State's law enforcement officials was such as to overbear [the Defendant's] will to resist and bring about confessions not freely self-determined . . . .'" State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)). The Supreme Court has held that in order for a confession to be involuntary, it must be the product of coercive state action. See, e.g., Colorado v. Connelly, 479 U.S. 157, 163-64 (1986).

On review, an appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). A trial court's factual findings in a motion to suppress hearing are conclusive on appeal unless the evidence preponderates against them. Odom, 928 S.W.2d at 23; State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. Hicks, 55 S.W.3d at 521. The application of the law to the facts as determined by the trial court is a question of law, which is reviewed de novo on appeal. Yeargan, 958 S.W.2d at 629.

The trial court considered the testimony of Drs. Angelillo and Hutson and numerous officers from the Memphis Police Department, the Defendant's age, mental capacity, intellectual disability, the manner in which the Defendant lived his life, and the Defendant's ability to live a normal life. The court stated that the police testimony was unrebutted and that there was no showing that the police coerced, threatened, made promises, or used violence to obtain the Defendant's statement.

Lieutenant Winters interviewed the Defendant in 1998, and the Defendant gave a statement to the police related to an aggravated assault. The Defendant stated that he understood his Miranda rights and initialed the waiver of rights form showing that he wanted to speak with the police in 1998.

Although the Defendant could not read, the police officers read the transcription of the Defendant's statement to the Defendant to ensure its accuracy. The officers' unrebutted testimony was that the Defendant wrote "yes" showing he understood his rights, signed, and dated the form. Although Dr. Angelillo testified that the Defendant "parroted" rather than rephrased concepts, the Defendant's answers during the police interview were in his own words. Sergeant Currin said that the Defendant paraphrased his Miranda rights in his own words and that the Defendant understood he did not have to talk to the police and could have an attorney present.

The Defendant was read his Miranda rights, once by Sergeant Currin and once by Mr. Helldorfer. Mr. Helldorfer said that he read the Defendant his rights because he knew the Defendant was illiterate. He said the Defendant answered his questions and gave clear, quick answers without hesitation. He asked the Defendant if he gave his statement freely and voluntarily, without threats and promises or coercion, and the Defendant said, "I gave it willing and freely." The trial court accredited the officers' testimony over Dr. Angelillo's opinion, noting that the officers' testimony contradicted Dr. Angelillo's opinion. The evidence does not preponderate against the trial court's findings that the Defendant gave his statement freely, knowingly, and voluntarily.

The Defendant argues, however, that the trial court should have focused on the Defendant's "mental illness" rather than whether there was coercive state action. Dr. Hutson testified at the competency hearing that the Defendant was not "mentally ill" and concluded that the Defendant was competent to stand trial. The trial court accredited Dr. Hutson's testimony in finding the Defendant competent. We note that nothing in the record shows that the Defendant was suffering from mental illness when he committed the offenses. The Defendant is not entitled to relief.

Although not related to the Defendant's motion to suppress, he contends that the trial court improperly limited his questioning of witnesses about his claimed "mental illness." He argues that he had the right to introduce evidence at the trial related to the reliability of his confession and that it "is reasonable to assume that a person who is 'mentally retarded' is more likely to be influenced by the questioning of a police officer." The State did not respond to this contention.

At the trial, trial counsel asked Lieutenant Currin if the Defendant "seemed slow" during the Defendant's interview. The State objected because the Defendant did not assert an affirmative defense, and counsel said his question had nothing to do with an affirmative defense but rather the "information [the police] had when they took the [Defendant's] statement. . . ." The trial court found that the question was valid on cross-examination but that it was "not proper to go into a lot of detail about mental retardation." The court said "questions about this officer and the conditions of the [D]efendant at the time he was taking the statement . . . [were] valid." Counsel did not argue to the trial court that his questions were to address the reliability of the Defendant's confession. Lieutenant Currin testified that the Defendant did not "appear slow" to him.

The Defendant did not assert an affirmative defense at the trial, including mental defect or insanity. During the hearing on the Defendant's motion for a new trial in relative part, he contended only that the trial court erred by finding him competent to stand trial and by finding that he gave his statement voluntarily. In addressing the Defendant's contention that the trial court erred by finding that he gave a voluntary statement, trial counsel said, "I don't need to go into argument for that, but I'll submit it based on that basis." The Defendant failed to contend in his motion for a new trial that the trial court erred by limiting his questioning about his "mental illness" to show the unreliability of his confession. Because the Defendant failed to raise the issue in his motion for a new trial, the issue is waived. See T.R.A.P. 3(e), 36(a); State v. Dooley, 29 S.W.3d 542, 548 (Tenn. Crim. App. 1988) (citing State v. Clinton, 754 S.W.2d 100, 103 (Tenn. Crim. App. 1988)). The Defendant is not entitled to relief.

### III

The Defendant contends that the trial court erred by denying his motion for a mistrial on the ground that an outburst during the trial prejudiced the jury and prevented a fair trial. He argues that the jurors were left to speculate about the cause of the commotion and that the court failed to give an explanation or cautionary instruction, which prejudiced the Defendant and prevented his receiving a fair trial. He argues that at a minimum, the court should have polled each juror individually. The State contends that the trial court properly allowed the

trial to continue despite the outburst and argues that the issue is without merit. We agree with the State that the trial court did not err by denying the motion for a mistrial.

After jury selection but before the reading of the indictment, trial counsel told the trial court out of the jury's presence that

> [w]e just had a family member of the victim in this case, I think he's identified himself as the son, to create a major disturbance in the courtroom. He was screaming at the top of his lungs, you killed my momma, you killed my momma, and other things . . . but he had to be forcefully removed from the courtroom.
>
> [He] created quite an uproar. He could be heard all over the building - all over the building. I'm concerned that the jury who is just . . . next door certainly heard that commotion and maybe heard him screaming, you killed my momma.

Counsel said the son's outburst prevented the Defendant's receiving a fair trial and moved for a mistrial. The court noted that a man was in the courtroom, caused a disturbance, said the Defendant killed his mother, and was forcefully removed from the courtroom. The court said the jurors were in the jury room, not the courtroom, when the outburst occurred. The court asked counsel if he wanted the court to question the jurors to determine if they heard the disturbance. Counsel wanted the court to question the jurors. He said that if individual jurors responded that they "heard something," he requested that the court question those jurors individually. The court stated that "if any individuals heard specific words or something along those times . . . we'll deal with that individually."

When the jurors returned to the courtroom, the trial court asked them if they heard "anything unusual" while outside the courtroom, and the jurors gave affirmative responses. The court asked if the jurors heard the substance of the commotion, but they gave negative responses. The court asked the jurors if they only heard "some commotion," and they gave affirmative responses. The court asked the jurors if hearing the commotion would "affect anybody's decision in the case," and they gave negative responses showing that the commotion would not affect their decision. The court told the jurors that they needed to make their decision based on the evidence presented and the law as given by the court throughout the trial. The court denied the motion for a mistrial and proceeded with the reading of the indictment.

A mistrial should be declared only if there is a manifest necessity for such action. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A manifest necessity exists

-27-

when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). This court will not disturb that decision unless there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990); State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

The trial court immediately responded to trial counsel's concerns that the jury heard the victim's son yelling, "You killed my momma," by questioning the jurors as a group to determine whether they heard the "commotion," and if so, whether they heard the substance of the commotion. The jurors heard the commotion from the jury room but did not hear the substance of the outburst. The court told counsel that if the jurors heard the substance of the outburst, the court would address those jurors individually. The need to question the jurors individually did not arise, however, because none of the jurors said they heard the substance of the outburst. The court instructed the jurors to reach their verdict based on the evidence presented at the trial and the law as instructed by the court throughout the trial, and there is nothing in the record to show that the jurors acted to the contrary. The record fails to show an abuse of discretion, and the Defendant is not entitled to relief on this issue.

## IV

The Defendant contends that the trial court erred by admitting multiple gruesome photographs of the victims at the trial. He argues that the court abused its discretion in admitting the photographs because the photographs' probative value was substantially outweighed by the danger of unfair prejudice. The State contends that the court properly admitted the photographs because the location of the victims' bodies and the inflicted injuries corroborated the Defendant's confession and established premeditation. The State also argues that the probative value substantially outweighed any prejudice, and in the alternative, that if the court erred, it was harmless. We agree with the State that the trial court did not err.

Officer Fleming described a photograph taken at the crime scene that showed Ms. Davis's body lying on the floor in the fetal position. The Defendant objected to the admission of that photograph and to a photograph of Mr. Smith's body lying on his bed on the grounds that the photographs were unduly prejudicial to the Defendant and that the two photographs were not necessary for the jury to reach a verdict. Trial counsel stated,

> They show blood. They show wounds that the jury does not
> have to see. These victims are dead. We stipulate to that.
> There's an autopsy report that's going to indicate . . . they're
> deceased. The autopsy will illustrate where the wounds are on

the body so that they are unnecessary to show these graphic photographs, which will only prejudice the jury against the Defendant.

The State argued the two photographs were the least graphic of the pictures taken by the police. The State argued that the photograph of Ms. Davis's body lying in the fetal position on the floor was relevant because the picture showed how her body was found and corroborated witness testimony related to her injuries. The State argued that the photograph of Mr. Smith's body lying on the bed showed an intent to kill, premeditation, and corroborated witness testimony. The State showed the court three additional photographs that it did not intend to introduce into evidence to demonstrate that the two selected for introduction into evidence were the least graphic and gruesome.

The trial court stated that the two photographs showed blood and injuries but overruled the Defendant's objection and found that the photographs were "highly probative" of the nature of the offenses, the positions of the victims' bodies, where the bodies were found, and the injuries the victims suffered. The court found that there was not "any prejudicial effect" and said that any prejudicial value of the photographs was far outweighed by the probative value.

The State also sought introduction of a photograph of Mr. Smith's face and shoulders taken at the Medical Examiner's Office after his body had been cleaned. The Defendant objected to the introduction of the photograph because it showed blood, injuries, and wounds. He argued the prejudicial effect substantially outweighed the probative value because the medical examiner documented the injuries during the autopsies and the injuries could be shown to the jury without showing blood and the actual injuries. The State argued that the photograph was probative of Mr. Smith's injuries after the body was cleaned and supported the medical examiner's testimony that he was struck a minimum of nine times in the head. The State also argued that the photograph was probative to identifying the victim as Mr. Smith. The State provided the court with a second photograph that it did not intend to introduce into evidence to show that the blood had been cleaned from Mr. Smith's body.

The trial court said the photograph showed "exactly the extent of the injuries and the locations and its probative value [was] great when compared" to the diagram of Mr. Smith's skull showing the location of the injuries. The court said that there may have been "some prejudicial value given the extent of the injuries" but that "any prejudicial effect . . . [was] far outweighed by its probative value." The photograph was received as an exhibit.

The trial court addressed three additional photographs that the State intended to introduce into evidence during the medical examiner's testimony. Although Ms. Davis's

body had been cleaned, the first photograph showed a large gaping wound in her neck after the medical examiner removed the fork. The Defendant objected on the ground that any probative value of the photograph was substantially outweighed by the prejudicial effect. He argued the photograph was too graphic to show to the jury. The court overruled the Defendant's objection, noting the body and the large wound had been cleaned. The court stated that there was "nothing overly graphic" about the photograph and found that it was probative of Ms. Davis's wounds. The court found that the probative value far outweighed any prejudicial effect.

The State also sought to introduce two enlarged photographs that showed the extent of the injuries and multiple wounds inflicted on Mr. Smith's head. The State said his wounds had been cleaned and the photograph showed a side view of the "depression of the head" and the severity of the wounds. The Defendant objected and argued that the trial court had allowed the State to introduce "essentially the same photograph" previously showing the injuries. He argued that the enlarged photographs were "overkill" because they were enlarged versions of the previously admitted photograph and were prejudicial. The court sustained the Defendant's objection and ruled that the previously admitted photograph was sufficient. The court, however, reversed its ruling and allowed the State to introduce one enlarged photograph in light of Dr. Ross's testimony that the smaller photograph failed to show all of Mr. Smith's injuries. The court noted its own inability to view all of the injuries in the previously admitted photograph. The court said an enlarged photograph had "great probative value" because of the multiple wounds described by Dr. Ross. The court allowed the State to choose one enlarged photograph to introduce into evidence.

The admissibility of relevant photographs of victims is within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion. State v. Carruthers, 35 S.W.3d 516, 576 (Tenn. 2000); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). As the supreme court stated in Carruthers, the modern trend is to vest more discretion in the trial judge's rulings on admissibility. Carruthers, 35 S.W.3d at 577 (citing Banks, 564 S.W.2d at 949); State v. Michael Carlton Bailey, No. 01C01-9403-CC-00105, Dickson County (Tenn. Crim. App. July 20, 1995), perm. app. denied (Tenn. Jan. 8, 1996)).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. Carruthers, 35 S.W.3d at 577 (citing State v. Gentry, 881

S.W.2d 1, 6 (Tenn. Crim. App. 1993)).  The court must still determine the relevance of the visual evidence and weigh its probative value against any danger of undue prejudice.  <u>Id.</u> The term "undue prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  <u>Banks</u>, 564 S.W.2d at 950-51.

When determining the admissibility of relevant photographic evidence, a trial court should consider:  the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.  <u>Id.</u> at 951.  In this case, all of the photographs at issue are accurate and clear, and they have substantial evidentiary value.  The photographs support Dr. Ross's testimony about the injuries inflicted upon the victims, the victims' identities, and the causes of death.  The photographs show the positions in which the bodies were found and the condition of the bodies when discovered by the police.  The photographs that showed the victims' injuries were taken after the bodies were cleaned by the medical examiner.  We believe that the photographs are not particularly gruesome and that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice, misleading of the jury, or confusion of the issues.  The trial court did not abuse its discretion in admitting the photographs.

V

The Defendant contends that the trial court erred by allowing a medical examiner who did not perform the victims' autopsies to testify about the autopsy results.  He argues that Dr. Ross's testimony violated his constitutional right to confront and cross-examine the medical examiner who performed the autopsies.  The State contends that the trial court properly allowed Dr. Ross to testify about the autopsy results and argues that this issue is without merit.

At the trial, the Defendant objected to Dr. Ross's testimony on the ground that he did not personally conduct the autopsies.  The Defendant argued that Dr. Ross was not the proper person to testify about the autopsies even though the medical examiner who performed the autopsies was unavailable to testify at the trial.  The State argued that Dr. Ross was a proper witness, that he was an expert, and that it was proper to introduce Dr. Ross's testimony both as an expert and as custodian of the records for the Shelby County Medical Examiner's Office.  The trial court overruled the Defendant's objection and found that the "rules" allowed for Dr. Ross's testimony.

-31-

We note that the Defendant did not object at the trial to Dr. Ross's testimony on the ground that his testimony violated the Defendant's right to confront and cross-examine Dr. Chancellor. The Defendant objected on the ground that Dr. Ross was simply an improper witness. The Defendant, likewise, failed to argue a violation of his constitutional rights at the hearing on the motion for a new trial. There, the Defendant argued that Dr. Ross was not a competent witness because he did not perform the victims' autopsies.

Tennessee Rule of Evidence 103(a)(1) requires "a timely objection or motion . . . , stating the specific ground of objection if the specific ground was not apparent from the context." A generalized objection that a witness is the improper person to testify about a particular subject matter does not alert the trial court or the State that a defendant contends his constitutional right to confront and cross-examine witnesses will be violated. As a result, the Defendant failed to preserve the issue and it is waived. See T.R.A.P. 3(e), 36(a); Tenn. R. Crim. P. 33; see also Derrick Bailey v. State, No. M2004-02434-CCA-R3-PC, Davidson County, slip op. at 5 (Tenn. Crim. App. Aug. 9, 2005) (holding issue of whether the trial court violated the petitioner's confrontation right by allowing a non-performing medical examiner to testify about the victim's autopsy results was waived for failure to make an objection stating the specific grounds of the objection when not apparent from the context), perm. app. denied (Tenn. Feb. 21, 2006). This court is limited to plain error review. T.R.A.P. 36(b).

Our supreme court has adopted the factors developed by this court to be considered

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The record must establish all five factors before plain error will be recognized and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. In order for this court to reverse the judgment of the trial court, we must conclude that the error involved a substantial right and "more probably than not affected the judgment. . . ." T.R.A.P. 36(b); State v. Yoreck, 133 S.W.3d 606, 611 (Tenn. 2004).

With regard to the trial court's allowing Dr. Ross to testify about Dr. Chancellor's diagrams of injuries, photographs, and conclusions, the Defendant has failed to show that consideration of this error, if any, is necessary to do substantial justice. The Defendant asks this court to determine whether forensic testimony by a witness who was qualified as an expert but did not perform the relevant autopsies violates the Defendant's confrontation right. Although in Crawford v. Washington, 541 U.S. 36, 68 (2004), the Supreme Court concluded that the standard for the admissibility of hearsay statements as it relates to the Confrontation Clause is that "testimonial" hearsay is admissible when the declarant is unavailable and there was a "prior opportunity for cross-examination," only recently has this court concluded that an autopsy report may contain testimonial hearsay subject to the Confrontation Clause. See State v. James Drew Freeman, Jr., No. M2011-00184-CCA-R3-CD, White County, slip op. at 15 (Tenn. Crim. App. May 8, 2011) (concluding that the autopsy report was testimonial hearsay where the victim's death was immediately considered a homicide based on the injuries and condition of the body). We conclude that the autopsy report contained testimonial hearsay based on the immediate suspicion that the victims were murdered.

Although Dr. Chancellor's autopsy reports were not admitted into evidence, photographs and diagrams were admitted. In any event, the record shows that any error was harmless beyond a reasonable doubt. See Coy v. Iowa, 487 U.S. 1012, 1012 (1988); State v. Powers, 101 S.W.3d 383, 397 (Tenn. 2003). In addition to testifying as the keeper of the records regarding Dr. Chancellor's conclusions, Dr. Ross also testified as an independent expert, basing his opinions on his review of the autopsy reports, photographs, and diagrams. Dr. Ross's testimony related to the victims' injuries and causes of death were identical to Dr. Chancellor's findings and conclusions. Dr. Ross added that it was possible Ms. Davis suffered severe coughing and some degree of asphyxiation as a result of the fork being lodged in her neck. Dr. Ross agreed with Dr. Chancellor, however, that the trauma caused by the fork in the victim's neck was not the cause of death because the fork did not sever the major arteries in the neck or cause an injury severe enough to obstruct airflow. Although Drs. Ross and Chancellor both concluded that the victims' deaths were caused by blunt force trauma, the Defendant had the opportunity to cross-examine Dr. Ross.

Also, the Defendant never argued that the victims' deaths were the result of something other than homicide, and the Defendant states in his brief that "the fact, means and manner of death were uncontroverted." The issue at the trial was not whether the victims were murdered but whether the Defendant killed them. In that regard, the Defendant gave a full confession. We cannot conclude that Dr. Ross's testimony affected the outcome of the trial. The error was harmless beyond a reasonable doubt. As a result, plain error relief is not necessary to do substantial justice.

-33-

# VI

The Defendant contends that the trial court erred by denying his request for a mistrial based on the State's failure to give him a written copy of an oral statement he made to the police before the trial. He argues that because the State intended to use the oral statement at the trial, the State violated Tennessee Rule of Criminal Procedure 16 and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), depriving him of a fair trial. The State contends the issue is without merit and argues that the statement was given to the Defendant's original counsel. The State argues, however, that if there was error in providing the statement, it was harmless. We agree with the State that the trial court did not err by denying the motion for a mistrial.

Lieutenant Currin testified that the Defendant made an oral statement that was reduced to writing in his supplemental report in addition to the signed written statement. He said the Defendant first denied knowing what happened to the victims. The Defendant said that he left the victims' home the night before the murders to look for "crack" and spent the night at a home on Crump Boulevard. The Defendant said he left the home on Crump Boulevard with the homeowner the next morning at 6:00. Lieutenant Currin said that later in his conversation with the Defendant, the Defendant eventually said he was responsible for the killings.

Lieutenant Currin's supplemental report shows that the Defendant's version of events was investigated and that it was determined that the Defendant left the home on Crump Boulevard "in the early evening" and did not return until 5:00 a.m. the next day. The report stated that the Defendant was confronted with this discrepancy and that the Defendant admitted to killing both victims. The Defendant stated that he hit Mr. Smith in the head with a tire iron while Mr. Smith was lying on the bed. The Defendant said that he went into Ms. Davis's bedroom, that they fought, and that he hit Ms. Davis, who grabbed a fork, but that he took the fork and stabbed her in the neck.

Lieutenant Currin read the Defendant's signed written statement which is as follows:

> Me and Ms. [Davis] were in the bedroom. I was trying to talk
> to her. She got up off the bed and I grabbed her by the wrist.
> She pushed me and I hit her. Then she grabbed a fork and I
> reversed it and it went in her neck. But she was alive though.
> Then [Mr. Smith] he made me click. He called me out of my
> name. He was threatening me telling what all he was going to
> do if he had to come back in there. He was calling me and Ms.
> [Davis] out of our names. He kept moving around in there. He

-34-

scared me. Then I ran out and grabbed a tire iron and started beating him. I didn't take any chances. He made me do that.

The Defendant objected to the State's mentioning of the oral statement because trial counsel was not provided a copy of Lieutenant Currin's supplemental report. He said he had neither seen nor heard of the statement before the Lieutenant's testimony at the trial. He was not original counsel, but he was told that he had the entire file from original counsel. He said he was certain he did not have the Defendant's oral statement. Counsel requested a mistrial on the ground that the Defendant had not received a copy of the statement. The State argued that the discovery materials were numbered, that page sixty of the discovery materials contained the supplement, and that the discovery materials were numbered when delivered to original counsel. The State argued that the Defendant gave a written statement and was on notice that he gave a statement and that even if the supplement was not in the discovery materials, the omission was harmless in light of the signed written statement. The State also argued that no Brady violation occurred because the statement was inculpatory.

The trial court found that the oral statement was a summary of the formal statement taken from the Defendant and that the oral statement was summarized in Lieutenant Currin's supplemental report. A copy of Lieutenant Currin's supplemental report was marked for identification purposes. The court overruled the Defendant's objection and denied the motion for a mistrial. The court found that trial counsel had the information contained in the oral statement because counsel had a copy of the signed written statement that contained the Defendant's confession. The court noted its concern that Lieutenant Currin testified that he did not believe the Defendant's first statement denying involvement in the killings and that he took steps to verify or disprove the statement. The court said

> those statements of denial . . . are not really subject to Brady, it's not really Brady material. But even more importantly, there's been no showing of prejudice to the Defendant as far as this is concerned. Obviously, counsel was entitled to it prior to trial, because it was a statement of the Defendant, and the State indicates that the statement was turned over.
>
> There was a break in the - I don't know the so-called chain of custody because of the fact that it went to the Defendant's previous counsel. . . . There were two lawyers representing [the Defendant] from the public defender's office. . . . But after reviewing the contents of the supplement, contents of the [signed written] statement, there really isn't any prejudice that

-35-

has been tendered to me, for those reasons, I'm going to . . . overrule the motion [for a mistrial].

The Defendant first argues that he was entitled to a mistrial because the State violated Tennessee Rule of Criminal Procedure 16(a)(1)(A) by failing to provide a copy of his oral statement reduced to writing. We apply the same standard as applied in Section III relative to mistrials.

Tennessee Rule of Criminal Procedure Rule 16(a)(1)(A) states that "upon a defendant's request, the State shall disclose to the defendant the substance of any of the defendant's oral statements made before or after arrest in response to interrogation by any person the defendant knew was a law-enforcement officer if the state intends to offer the statement in evidence at the trial." Tenn. R. Crim. P. 16(a)(1)(A). The discovery materials relevant to this issue are absent from the record. The State told the trial court that the discovery materials delivered to original counsel included the supplemental report containing the Defendant's oral statement reduced to writing. The trial court accredited the district attorney's assertion that original counsel received the supplemental report, and the record fails to show that the State violated the requirements of Tennessee Rule of Criminal Procedure 16(a)(1)(A). We conclude that the record fails to show a manifest necessity for a mistrial.

The Defendant also argues that the State violated Brady v. Maryland by failing to provide a copy of his oral statement reduced to writing. In Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to establish a due process violation under Brady, four prerequisites must be met:

1.  The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);

2.  The State must have suppressed the information;

3.  The information must have been favorable to the accused; and

4.  The information must have been material.

-36-

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995); see also State v. Evans, 838 S.W.2d 185 (Tenn. 1992). Evidence that is "favorable to the accused" includes evidence that is deemed to be exculpatory in nature and evidence that could be used to impeach the State's witnesses. State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995); State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); see also United States v. Bagley, 473 U.S. 667, 676 (1985).

The State provided original counsel with Lieutenant Currin's supplemental report containing the Defendant's oral statement. The State cannot be faulted for the supplemental report not being delivered to trial counsel after it was delivered to original counsel. The Defendant has failed to show that the State suppressed the supplemental report. Because there is no evidence establishing that the State suppressed the Defendant's statement, we conclude there was no Brady violation.

However, a delayed disclosure of information requires a different analysis than a complete nondisclosure. "[D]elayed disclosure requires an inquiry into whether the delay prevented the defense from using the disclosed material effectively in preparing and presenting the defendant's case." State v. Caughron, 855 S.W.2d 526, 548 (Tenn. 1993) (citing United States v. Ingraldi, 793 F.2d 408 (1st Cir. 1986)); see State v. Joan Elizabeth Hall, No. 01C01-9710-CC-00503, Lincoln County, slip op. at 19 (Tenn. Crim. App. Jan. 28, 1999), perm. app. denied (Tenn. July 12, 1999) ("[I]f there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, Brady normally does not apply, unless the delay itself causes prejudice.").

Unquestionably, the Defendant's denying any knowledge of what happened to the victims was exculpatory. The remainder of the information, however, was similar to that in the signed statement, which was provided to the Defendant before the trial. The Defendant was provided a copy of the supplemental report at the trial and was not prevented from using the information in preparing and presenting his case. See State v. Caughron, 855 S.W.2d 526, 548 (Tenn. 1993); State v. Ernest B. Eady, No. E2000-00722-CCA-R3-CD, Knox County, slip op. at 7 (Tenn. Crim. App. Feb. 13, 2001). We conclude that the record does not show a manifest necessity for a mistrial. The Defendant has not identified any prejudice flowing from his not having the oral statement before the trial. The Defendant is not entitled relief.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE